Good morning, may it please the court. I'm Virginia Bondurant Price on behalf of Overhead Door Corporation. Here, plaintiff did not offer the type of proof you typically have in a product liability case under Virginia law. She had the veneer of a product liability case. Plaintiff lacked the required evidence and experts to prove her product liability case. She resorted instead to using buzzwords and legal terms of art as a smokescreen to reverse and render final judgment for Overhead Door. Plaintiff proceeded on claims of negligent design through negligence and breach of implied warranty and failure to warrant. Plaintiff failed to establish her design defect claims for three reasons, each of which is dispositive. First, plaintiff failed to show the subject container was unreasonably dangerous for its ordinary and foreseeable use, either through an industry standard or through reasonable consumer expectations. Second, plaintiff failed to establish causation. Third, plaintiff's design expert, Dr. Singh, should have been excluded. Virginia law is clear that manufacturers are not required to make accident-proof products and a manufacturer is not an insurer of its product safety. Rather, Virginia law requires a plaintiff to prove that a product contained a design defect that rendered it unreasonably dangerous for its ordinary or foreseeable use. And Virginia allows a plaintiff to establish that through failure to comply with the government standard, failure to comply with an industry standard, or failure to comply with reasonable consumer expectations. Mr. Price, can I ask a question that I think is related both to the design defect issue and the proximate cause? It was conceded at trial that the crate in this case was designed in a way that it included a handhold that would be used to either lift or pull or push the crate in the normal course of work or operations. So why isn't it just so obvious, patently obvious, that if you have a crate that has a handhold that's intended to be used to be pulled, and when someone actually uses the crate in that fashion by pulling on it, and it snaps and breaks, and there appears to be no evidence that the crate was otherwise damaged or defective, although I imagine you might have some dispute about that, but why isn't that just so obvious that you don't really need an expert? It's just clear that for whatever reason, the crate didn't operate as it was intended, and that  Your Honor, here, those aren't precisely the facts of this case. It's not in the normal use of just pulling and pushing on the crate where the handle broke off. In this instance, it was stuck on forklift tines, and it's the plaintiff's burden of proof to establish that typically through expert opinion in a product liability case that that crate... and you assume that someone is pulling on the crate, a person of normal weight and height, why does that matter in this case? I mean, if it was intended to be a handhold that shouldn't have been susceptible to somebody pulling on it and the plank breaking, why does that matter? Here, it matters because it's plaintiff's burden of proof to show that the product was unreasonably dangerous for its ordinary and foreseeable use. Here, plaintiff tried to establish to do that through an industry standard that wasn't applicable. It was an all wood crate without a handhold, whereas here it was a triple ply corrugated container with a wood end crate that had a handhold. Plaintiff was obligated to show that that handhold under ordinary and through showing that the handhold did not meet some sort of strength or pull resistance requirement. It's not in a layperson's understanding of what pull resistance a crate may or may not have. Just like any other handhold, there's going to be some sort of resistance at which it's going to fail. It's the plaintiff's obligation to demonstrate that this particular container didn't meet the pull resistance for this particular purpose and they didn't do that. But isn't the proof in the pudding in the results? It didn't, right? I'm having trouble understanding that response. Well, Your Honor, their obligation is to show that the pull resistance of the crate or the handhold on the crate was unreasonably defective or unreasonably dangerous for the ordinary and foreseeable use. First, they would have to show that it would be foreseeable and ordinary to pull on this crate eight feet up in the air with a person on a ladder rung pulling with all of his might, his entire strength in the C position, that that would be an ordinary and foreseeable use. They didn't do that here. Additionally, they would have had to have shown that the handhold or the crate or the container didn't meet some sort of safety standard. The safety standard under Virginia law is established through either a government standard, an industry standard, or a reasonable consumer expectation. Here, it's not sufficient that it just broke. Virginia law is very clear that- Was there an applicable, Ms. Price, is there an applicable standard for a crate like this? I thought they were sort of one of a kind. They're produced as needed. So, I'm struggling to find, to figure out exactly what standard would have applied in this case. Your Honor, there may not have been an exact industry standard. That's, again, plaintiff's burden of proof to come forward with an industry standard, which we failed to comply. But if there is no industry standard that's directly on point, that's where Virginia law turns to cases like Motor Company versus Bartholomew, where there is no industry or government standard that's directly on point. But the expert, through his scientific engineering background, is able to point to industry norms, use testing, look at the product itself, and demonstrate what the safety standard should have been and how the defendant failed to meet that. Plaintiff didn't do that in this instance. And it's not- But the counsel didn't, Dr. Singh, do that. He said that if you want to have something where you expect to be pulled over 200 pounds, if you do that, you'd have to have the cleats and those kind of things. That's exactly what he was just saying. Because he didn't have an industry standard. Never said, you know, 30 or 39 wide here, but he said that you have to do these kind of things if you're going to do that. Your client didn't test it at all for safety. I mean, for really. Respectfully, your honor, what Dr. Singh said was, at first, he said D6039 was the applicable standard. And then he walks away from that when he's, frankly, questioned by the district court about that. He then turns and says, okay, you can design a container distinct from, you know, with different characteristics than the D6039, but then you'd have to test it. And he did not go on to say what kind of test you would have to do. He vaguely described ASTM 4169. He vaguely described pull resistance standards that you could use to test the handhold, but he doesn't say that he did those or that this container failed to meet those testing. Importantly, Virginia law requires that you prove a product to be unreasonably dangerous through a defect in manufacture, design, or failure to warrant. It does not allow a standalone failure to test. And so, Dr. Singh simply pointing and saying, oh, well, you can deviate, but then you'd have to test it, and they didn't test, doesn't demonstrate a defect in this instance, because it doesn't establish that it's unreasonably dangerous for the ordinary or foreseeable use. And even if you accept a failure to test here, Dr. Singh didn't go on to say what that test would have been or how overhead door failed to meet that test. Ms. Price, isn't part of the problem here, though, is that first of all, the original crate or box wasn't preserved, right? So we know you couldn't test that. And because these are one of a kind boxes, maybe you can help me on this. It either wasn't clear whether or not your client could actually produce one, or it may have been that the plaintiff was concerned about whether or not that the one that they might produce as an exemplar might not actually match up with the exact contours and dimensions and properties and characteristics of the box in question. So wasn't the plaintiff in a bit of a difficult position here? No, Your Honor, they were not in a difficult position here. They asked for a box during discovery. You're right, through no fault of the parties, the box was discarded after the accident. So the exact box, subject box or container was not preserved. But plaintiffs asked in discovery for overhead door to produce an exemplar. And at first, overhead door declined. And that is a discovery response dated April of 2018. Plaintiffs sat on their laurels, so to speak. Their expert report through Dr. Singh was, his first expert report was signed on September and September of 2018. It's not until July of 2019 that plaintiffs bring up this discovery issue. They didn't move to compel an exemplar box. They didn't do anything except on the eve of trial, they filed a motion in limine to prevent us from asking why Dr. Singh didn't test. But in actuality, we did offer during that time period to make them an exemplar box. And they declined because they said that we would make some sort of super box. So this was really a discovery issue that they're now trying to make a part of their case, both at trial and then now on appeal by excusing their lack of testing in this case by saying they didn't have an exemplar box. And one other point Judge Diaz is that they knew how this box was made. They knew what size nails we had. They knew what kind of lumber we used, what size lumber. They could have made the box themselves. Dr. Singh walks away from his D-6039 saying that this is not the applicable standard. The district court recognized that that D-6039 was not the applicable standard, saying when comparing D-6039 to the subject- This is a question I think Mr. Emmert needs to answer as well. So if I understand you correctly, the issue with proximate cause is that because there was no baseline by which the box, there was no established baseline with respect to any pull resistance, however you want to call it, that it's just impossible to prove that any possible defect in the box was the proximate cause because we don't know exactly how much pull resistance the box was intended to withstand. And we don't know whether or not the box was damaged either as a result of the operations on that day or beforehand. Is that right or is it more than that? I would just correct a few things Judge Diaz on our position. So the first is on the but-for causation. On the but-for causation, Dr. Singh never gets them to their requirement on their burden of proof on but-for. And the reason for that is because he cannot show that but-for the absence of the exterior end cleat, which is what Dr. Singh says is the design defect of our box, the absence of end cleat, exterior end cleat, I should say, that Mr. Sardis' injury would not have happened. And it's not impossible to discern how much pull resistance Mr. Sardis would have put onto that box. It's essentially a math equation that an expert could do knowing Mr. Sardis' weight and height and then knowing how much resistance he could have put on that. They could have done that testing. They could have gotten an exemplar box. They could have pulled on the box and seen what the pull resistance was of the subject container that had interior end cleats but did not have exterior end cleats. They could have then seen if the pull resistance that Mr. Sardis likely would have put on the end of that box would have sustained him pulling on it and then likewise putting the exterior end cleats onto the end of the box and testing it that way. That's precisely what they should have done here and they failed to do it and they therefore did not establish but-for causation. As to our other proximate causation argument, they cannot establish proximate cause in this case without the splat, without the missing splat. So there are pictures of the container itself. There's also testimony that just before Mr. Sardis' injury the container was taken end over end before it was put up on top eight feet on the rack. No one is able to testify, including Mr. Lawrence, including Dr. Singh, what the condition of the splat was. Without the condition of the splat, there's no way to know if it pulled off due to some issue. It got loosened up going end over end and the fact that it sat in the warehouse for two weeks. Mr. Lawrence testified and Dr. Singh testified that it didn't look like the container itself had any damage but no one was able to identify whether there was any damage to the knowing the condition of the splat. They cannot say whether or not the splat pulled off because of damage to it or some other reason. Your position is if the box is gone, as here, it was gone right after the accident, then no plaintiff could ever prevail in any case. Judge Gregory, respectfully, that's not our opinion. That's the result of what you just said. You said without knowing that, you said without being able to inspect the splat, you can't prevail the proximate cause. Did you say that? If I did, your honor, I apologize. No, I take it for your word you didn't. But tell me, what is your position about not being able to determine what it looked like? Go ahead. So, I think the distinction that I'm making is there's, under Virginia law, there's, my argument is not that you can never, a plaintiff could never establish a product defect with a missing product and I see that my time has expired. No, go ahead. I'm asking the question. Go ahead. Sure. It's not that a plaintiff can never establish a product liability case without the product. The distinction is that when the essential piece of evidence, like the splat, is missing, you cannot rule out other potential causes of why that splat pulled off. This is like the Stokes case with the saw and how the saw had been stored away and there was a question of whether it had been improperly stored such that one of the component pieces was damaged and that resulted in Mr. Stokes eye injury. And that's what we're saying this case is like. With the physical evidence of it being stored for two weeks, not knowing the condition of the splat, the fact that it had been taken end over end directly on those splats, that there is a distinct possibility that it could have pulled off for some other reason, like it being damaged. And that plaintiffs, in a case where there's a missing product, would have to rule that out in order to establish proximate causation. Well, that's what I just said. Basically, that formula, I mean, you can't prevail because you said there would always be speculation as the possibility that something else happened to it because you don't have it, correct? Well, Your Honor, if there's a missing product and there's no other potential proximate causation, then you would not need the product in that instance. That's what this case might be. That is, you don't need it because you told them to hold on to it, to pull it around and everything. That's the consumer expectation, isn't it? It's like carrying a bag. It's a bowling ball bag. And you pick it up and the ball, it falls and the ball breaks your toe. You get a broken toe. And you say, well, you can't recover because you don't know how much pressure it is that it should be able to carry a ball or not. Well, the handle broke. Well, respectfully, Your Honor, in that analogy, the bowling ball bag carrier is designed to carry the bowling ball. What plaintiffs have not established here is that the ordinary and foreseeable use of the product was to pull on it with all of your might in the seat position, eight feet in the air, while the container is stuck on forklift time. Well, can I suggest something that your client didn't say that it could not withstand a six foot five male weighing 300 pounds pulling on it, did it? There was no parameters at all, just a human being could pull on it. And you know it weighs 200. So in terms of resistance, I mean, it's just like the bowling ball. I should be able to pull on it. Someone at five foot five and someone who's six foot five. Well, respectfully, Your Honor, that goes to a little bit of our failure to warn cause of action. And on that issue, it goes to notice, whether or not overhead door was ever put on notice regarding whether it knew or should have known that users were using this eight feet in the air, pulling on it eight feet in the air while it was stuck on forklift time. And he was pulling with all of his might. And that is something that they did not show. And that's part of the reason they also failed to establish their failure to warn claim. Well, your 36th deputy just didn't say, you know, he didn't consider it safe or right. Well, the 36th witness did testify about some generalized safety standards and issues. But what the failure to warn requires and their burden of proof on that is not to establish some generalized safety issue. They have to choose. They have to prove new or had reason to know about the specific risk. And the specific risk here would be that somebody was pulling on the handhold eight feet in the air while it was stuck on forklift times with all of his might and that the handle would break. And they had no evidence that overhead door had any notice of either of that. So, Ms. Price, if the crate had been on the floor, and in fact, this happened but the person who was working with the decedent that day, either a deposition or somewhere testified that he had pulled a crate along a floor and it snapped and he'd fallen backwards and landed on his rear end. But if that had happened to the decedent in this case, and he again had hit his head and suffered some injury, maybe not death and something less. At that point, you no longer have the argument right about the particular conditions. But I suppose you still might have an argument about the condition of the box before it was handled by that person. Is that fair? That's fair, Judge Diaz. But one other thing that I would add is that that testimony came from the court. It was not competent testimony that was before the jury to which they could consider. And part of the reason that it was not before the jury was one, it was not substantially similar to the fact that we have here. So, the district court had excluded it. But the other almost more important reason is that overhead door never had notice of that incident or those three incidents, as you will. They only were provided to Washington overhead door, which is not the same thing as overhead door. Overhead door never had notice of those three incidents. Yeah, no, I understand that. But apparent, but notwithstanding that, all that stuff came in front of the jury. And I don't imagine that was helpful. But in any event. I see that I'm very much over time. I'm happy to answer more questions or see you again on rebuttal. Thank you, Ms. Price. Mr. Emert. Good morning. I'm Steve Emert and I represent Andrea Sardis, who is the personal representative of her late husband's estate. This oral argument convinces me that von Moltke was right when he said that no plan of battle survives first contact with the enemy. I have a really nice speech here, but what I've just seen in the last 15 minutes or so convinces me that I need to start by going for the juggernaut of this. And that's by establishing that if overhead door is correct about this, and that standards don't apply as long as you're able to, I'll call it dumbed down one of the components. Then imagine what happens with products liability cases. Every manufacturer will be free if they wish to evade well-established, well-researched and consensus standards of the industry by simply making the product a little bit less or not meeting one standard. Overhead door in this situation can make a crate out of paper mache and then claim that we don't have to D6039 because we don't have a thing that beats the crate. The definition... Mr. Emert, if I could ask kind of a threshold question here that opposing counsel didn't address this in opening argument, but did raise it on brief. It appears that with respect to the design defect claim, Dr. Singh responded to Judge Gibney when asked after Judge Gibney had described the crate or box in this case, whether that standard applied. And as I read the record at 539, he says, no, that it didn't, but you'd still have to test, but never identified a particular testing standard or whether or not a box of that type would meet the standard. So to me, that raises a threshold dauber question here. I looked at the initial ruling of the district court before trial, which to say that it's brief is maybe to give it too much credit. Even though it acknowledges that there were legitimate questions raised about the expert witnesses, the district court simply says, well, you know, that's for the jury to figure out using cross-examination. But under our dauber precedent, the trial court has an initial gate to assure that the expert witnesses testimony is reliable and it's relevant when it's submitted to the jury. And it looks like in this case that the district court simply abandoned its gatekeeping function. So how do you answer that? And how can the case go forward if the trial court simply says, well, you know, my dauber gatekeeping function, I'm now ceding to the jury to determine based on cross-examination? The way I read the record is not as dismissive of what the district court did in this case as what Your Honor suggested. The court didn't simply say, I'm going to let the jury decide the dauber issue. Indeed, the court reviewed the credentials of both experts, ours and theirs, reviewed the background of the literature and the depositions and the other physical evidence that the experts considered and decided that the expert had the capacity to offer an opinion on these things. In addition, the primary negligence in this case is not so much whether the includes were on there. The primary negligence is the presence of a handful because, and this relates to the proximate cause issue as well. If there's no handhold there, there's nothing for Angelo to do. Mr. Embert, if I'm looking at pages 287 and 289 of the joint appendix, which is the dauber ruling, where do I find any of that? I don't think that you're going to find that the judge specifically lays out what I've just ruled, what I've just suggested here. What I will say is that the judge had all this to consider and found that there was an adequate foundation for the experts to offer an opinion on these things. Not that the expert had a particularized standard that would have applied otherwise. We think that the standard that applies to section 39. I understand your argument, but what I'm asking you is where does the trial court do that? Because I don't think that our dauber precedent allows us to assume the trial court went through the litany of things you've described. We look for some sort of record evidence that it actually did it and said that. Okay, I don't have an answer for you right now. If you would permit me, I'd be happy to submit a letter to the courtroom clerk within three hours at the end of this argument that will address that if I may. Is that permissible? Well, I mean, do you think it's somewhere other than pages 287 and 289? I mean, that's the trial court's dauber ruling. I don't know, your honor, and I'm not going to guess right here today and possibly get it wrong. Counsel, I suppose your response might be the court is not obligated to give a long discourse so that you can rule on it. The question is, is there evidence in the record that would support the finding? I think that's what you were saying. Evidence that was there, but not the fact. Actually better phrased than my answer, but yes, I don't think that the court has to lay out a litany of details as to what constitutes the background of the dauber ruling. There's no doubt that if there had been no, as I just mentioned with regard to proximate causation, there'd been no handhold, there's no accident, there's no injury. Mr. Ember, can I ask you about that? So that's literally true, I suppose, that if there'd been no handhold, there'd be no accident in this case. But I don't think it's fair to say that simply because a box has a handhold that that makes it per se defective. I mean, the question is, did the company, when deciding to include a handhold as part of the design of this box, account for the particular circumstances of how these boxes would be manipulated or used during the course of normal operations? And so that would presumably require some level of understanding of much pressure a worker might put on the box during the normal course of operations. Of course, your colleague on the other side says that this particular day, these workers were operating under very abnormal conditions in the sense that the box was up eight feet, it was up on tines, all of that business. But I don't think it's right to say that because of a handhold, that that's the end of the story. Maybe you can elucidate on that. But the position that our experts took, and that we continue to take here, is that if you meet the standard, you've got a presumptively safe product. That's why the standards exist. Well, but the standard in this case didn't include a handhold, right? Right. And the fact that it doesn't comply with the standard doesn't mean that the standard doesn't apply. It means it doesn't meet the standard, and therefore it's not presumptively safe. In that case, both experts, theirs and ours, concluded that if you're going to vary from the terms of the standard, you have to test it. You have to test it first, before you send it out into the stream of commerce. That's what Mr. White said, that's what Mr. Singh said. The testing is essential if you don't rely upon the already well-vetted standard that's in ASTM 6039. So that's what happened here. They decided they were going to go and, as I called it before, dumb down the product and not meet the standard, and then claim that the standard doesn't apply. That's not what it said. The standard contains Mr. Emmert, is it your position that this 639 standard applied or didn't apply? I think it does apply. It applies whenever there is a container with structural framework fastened together to form a rigid structure. That's the definition of framework. How do you explain Dr. Singh's answer to the district court at JA 539? It wouldn't be governed by 6039. I think that it's inconsistent with other answers that he gave to other questions when he said that it does apply, and the jury has to decide which one of those two is correct. But there's no question that it meets the definition of a crate. The only thing that they did was they took down some of the safety requirements. They took down is the wrong phrase. They failed to adhere to some of the safety requirements that this standard incorporates based on extensive testing. If an expert witness testifies on both sides of the answer, and basically says yes it does and no it doesn't, why is it up to the jury when it's your witness to decide which of the two stories is correct? If they're choosing between two opposing experts, they certainly do that all the time. But you can't rise above your own evidence, and when your own evidence is contradictory, how is the jury supposed to do that? I'm not going to go pinpoint it right now in the second in answering it, but there is a quote, a citation in our brief that said that when there is contradictory evidence, even from a single witness, it's up to the jury to decide which to accept. That doesn't mean the evidence is inadmissible or that it's thrown out. It means that the jury has to resolve inconsistencies in the testimony. And in the jury instruction, the charge, the jury's told you can believe the testimony of a witness or even part of the testimony of a witness. That's consistent with what that doctrine says, but a jury has to make up its mind about that. But fundamentally, we do believe the standard did apply. There's no question this is a crate, and the only question is can overhead door decide to ignore the safety standards contained in the standard in order to create something else that is immune from any of these safety standards. We already know that we don't have the crate here, but we do have something that's just as good as meeting the safety standard, and that is consumer expectations. The Elever-Mahiros Doctrine holds that I can win a case like this in three ways, showing industry government safety standards by testimony of competent expert witnesses or by establishing consumer expectations. And consumer expectations can come from published literature or if you can come from positive testimony about what consumers expect. We have both. As far as the positive testimony, it's the most compelling form, and that's overhead doors admission from Mr. Knievel, his corporate designee under Rule 30b-6, who said, yes, a reasonable consumer pulling on this can reasonably expect that it'll hold up. We also have the literature. If you don't accept D6039 for some reason, I hope you will, but you still have the handbook of paper and wood products. But is it paper? That's a published literature, and that's under the Elever-Mahiros Doctrine, page 420 and 421 of that opinion, I think. You'll find that that's satisfactory proof of what consumer expectations are. Mr. Emmer, can I, so let's assume that you're right and that that's a reasonable consumer expectation, but your colleague on the other side says there are two components of this approximate cause. Question one is the but-for causation, and the other one is the question as to what the condition of the box was on the day in question and whether or not that there was something that intervened that perhaps weakened the structural integrity of the box. So what's your response to that? They're asking the court to decide based upon an imaginary effect that there was no evidence of. Keith Lawrence, who was handling the box the same day, right alongside Andrew Osardis, testified that he saw nothing wrong with it. He was there looking at it and physically handling the box and said there wasn't anything wrong with it. Drew was entitled to credit that and find that he was telling the truth. But as for imagining a possible defect and saying we have to disprove a negative, I don't know how we're going to be able to do that when we, but we don't have to face that problem. We do have positive testimony that the box was claimed like this. As far as the approximate cause issue is concerned, I do want to mention, I think it's fair for me to do this, that Dr. Singh was able to testify to a direct question. Do you have an opinion to a reasonable degree of probability that the defects in this box that you testified to approximately caused the injury? And without objection, he said yes. He raised that as a waiver issue in our brief. And Overhead Door has argued in reply that it twice objected, once in a motion in limine and once in a motion to strike later in the case. Motion to strike later in the case doesn't excuse the need under Rule 103 to object in a timely manner. Mr. Amber, can I, sorry to interrupt again, but you said, did I hear you correctly, you said defects as in plural in the box? Well, there are two defects. It has a handle. And it doesn't include exterior cleats that would have secured the exterior. But those are the defects that you found. But yes, you did hear me correct. There are two. As far as the motion to strike is concerned, that's too late under Rule 103. They have to object before the witness gives the answer. You can't go back and say, Your Honor, that question 20 minutes ago I meant to object to and I'm going to object to it now. As far as the motion in limine is concerned, when I saw that in their reply brief, I checked the court's record. I checked the motion that they made. I checked the transcript of the hearing. And I checked the district court's ruling. And I assume that you've done. And I found that they did not object to this question in that motion in limine. The motion in limine was directed to an opinion as to the mechanism of the crate's failure, not to the proximate cause of the injury. So in that sense, there has been no contemporaneous objection. If the court is permitted to, if a litigant is permitted to evade this requirement, then you're going to be much more like a trial court in evaluating these objections. The opinion that Dr. Singh was allowed to give without objection meets the preponderance standard. And this was a jury issue. There are three issues on which the simplest path for you to affirm this judgment can be laid out. First, it's an unreasonably dangerous product. We've got an admission from their corporate designee about consumer expectations. We've also got product literature. Even if you don't accept the testimony of experts, you have that much, and that makes it a jury issue. Second, on the first material breach, that too plainly is a jury issue. And the jury was allowed to decide whether a company that has safety as a core value, a core company value, and it knew that people could be killed or injured when their products failed, would do something about safety. Indeed, Overhead Door at trial pressed this issue by trying to prove to a jury that Mr. Sardis was contributorily negligent. They urged that if you'd only handled the product safely, that he would still be here. This is the safety information that they refused to provide anybody, and the jury could easily- Mr. Emmert, so with respect to that, and I'm not, this really doesn't go to the issue of contributory negligence, but the question of how the box was used on that day, does that matter at all? I mean, the fact that it was where it was, eight feet above in the air, stuck under these tines, under, right, there were some ladders below it, so it might have been stuck there too. What about all of that? I mean, that doesn't seem like to me to be the typical use of the box. Logan versus Montgomery Ward says that a manufacturer has to make it safe for its expected uses, anticipated uses, and for all reasonably anticipated misuses. So even if they're claiming that it's a misuse, there's no assertion here that nobody could possibly assume that anybody would do it while it's on a forklift. I think that the location of the manipulation of the truck, of the crate, doesn't make a difference in this analysis. The question is, was it designed in such a way that it was unreasonably dangerous? We have testimony of that. On the issue of proximate causation, as I've indicated, the objection is waived. You can decide the appeal on these three issues alone, because that's enough with a special jury interrogatory. The law doesn't allow a manufacturer to skimp on safety, to make the consumer bear the risk of failing to meet standards, of failing to provide a safe product, failing to test it to make sure of it. But that's what happened in this case. Overhead Door allowed, unfortunately, Mr. Sardis to be the test for whether that was a safe product, and he paid for it with life while using the product in exactly the way that the manufacturer had intended. Okay, thank you. Ms. Price, you have some time deserved. Apologies, I was on mute. I first want to address the causation waiver argument. We cited in our reply brief, on page 17 of our reply brief, not to a motion in Lemonet, as Mr. Emmert alluded to, but actually to our Daubert motion. We moved on causation with Dr. Singh in our Daubert motion, and so it is properly preserved on that. You raised it in your reply brief? I'm sorry, your honor? You raised it in your reply brief? Yes, sir. On page 17 in our reply brief, we responded to the waiver issue by pointing to the objection that we made to Dr. Singh's causation arguments in our Daubert motion, pre-trial. So you didn't, in the opening brief, you did not refer to it, did you? That is one of our issues presented in our opening brief, the but-for causation argument, yes, sir. Thank you. As to Mr. Emmert's argument on testifying to the ultimate issue, the Stokes case is clear that an expert cannot base his answers on an ultimate issue on an insufficient factual basis, which is our argument on but-for causation, is that Dr. Singh did not have a factual basis to support that answer, which was yes. Did you object to that? It was not objected to, your honor. All right, good. Other than the fact that Dr. Singh did not have a factual basis to support   in our Daubert motion pre-trial, but it was not objected to as a question at trial. As an answer at trial? As a question and answer at trial, yes, sir. So, counsel, I'm a little confused. Are you saying, with respect to Dr. Singh's testimony on the ultimate issue, approximate causation, you did or didn't make an objection? We moved pre-trial and a Daubert motion on his entire causation opinion, and, well, on him totally on Daubert, but including his causation argument. When he was asked the ultimate issue at trial, the question was, you know, were the lack of exterior includes the proximate cause of Mr. Sardis' injury or something along that line, and the answer was yes. That specific question was not objected to. We've raised the issue also in our Rule 50B motion and now, obviously, on appeal. Yeah, but you didn't move to strike the response at the time either, correct? Not at the time that the question was asked, no, sir. Judge Agee, to answer your question on the district court's performance of the gatekeeper, he did not perform that function. That's part of our argument on appeal, and that can be found at JA 1179 through 1181, which is his final opinion on the case where he basically dictated to the jury his gatekeeping function, which was to decide which of the one expert's opinions he wanted to leave, which that's the role of the district court. Counsel, that would have seemed like to me to have been your threshold argument because if there's a Daubert failing, how can it go forward to the jury? Other than mentioned in your brief, you don't seem to be particularly excited by that particular line of argument. And I see that my time's expired, Your Honor. I'm happy to answer his question. Thank you. I think part of the Daubert analysis is what we led off with, Your Honor, which is the lack of standards applying. That was a threshold question that the trial court had to determine and a basis of which to exclude Dr. Singh. We ask respectfully for the court- I was surprised before you, I'm sorry, not so soon. So the standard issue obviously is important, but Mr. Emmer made a couple of points about the causation issue, which I want to tease out with you. The first one was that you're essentially requiring the plaintiff in this case to sort of account for each minute and every hour of the day of a product from the day it leaves your client's warehouse to the day it shows up at the worksite in order to disprove a negative, as he put it. So that's point number one. And then he also mentioned that your client's representative at the 30B6 deposition essentially said that- agreed with the notion that a consumer would reasonably expect that if he or she pulled on the slap that it would hold. And that seems to me just to be correct as a matter of common sense. So I don't- standard or not, why isn't there a problem here with respect to the design of this product? Under Virginia law, and I'll address the reasonable consumer aspect first, Your Honor. Under Virginia law, plaintiffs have the burden of proof to establish that the product was unreasonably dangerous in its ordinary and foreseeable use. And there are three ways that you can do that. Okay, so let me stop you there. And I'm sorry to interrupt, but Mr. Emmett mentioned that your client would also have an obligation to protect against misuse. Is he right about that? No, not just misuse. It would have to be foreseeable. The standard is ordinary ordinary use or foreseeable use, which would include foreseeable misuse in some instances. Here, it's not foreseeable that somebody would use this container in the way that Mr. Sardis did. Not all handles are accident proof. Not all products are accident proof. That's not the law in Virginia. An analogy would be taking a banker's box, for instance. We're all familiar with banker's boxes. We all use them almost routinely. Some people throw them up high on bookshelves. They're not to pull in a specific way. If I went back downstairs into my file room and I climbed up on a ladder six feet in the air, and I grabbed a hold of an extremely heavy banker's box, and it was stuck, and I pulled on it as hard as I could, and it ripped. That's not a foreseeable use, an ordinary foreseeable use of the banker's box to pull on it with all of your money when it's that high in the air. It's a tragic event that happened with Mr. Sardis, but it's a tragic accident, a freak accident, if you will, for lack of a better term. But it's not something that overhead door knew or had reason to know about or anticipated that someone would use their handhold in that particular fashion. So, in this instance, it was not a foreseeable use. And to answer your question on the reasonable consumer expectation, that has to be cabin. And it cannot be just a reasonable consumer, and you point to a generic statement by the corporate representative that its products are generally safe. What Mr. Knabel testified to was that you can reasonably expect the handhold to hold. He did not testify and provide any sort of roadmap for what that safety standard would have to be for the handhold to hold. If I had a locked car, and I was pulling on my door handle, and I was pulling on it, and it wasn't opening, and I decided to get down in the seat position and pull as hard as I could or put my leg up on the car and use my leg as leverage to try and open that door handle, that door handle is going to break too. Is that a foreseeable use of the door handle? Is it foreseeable with the banker's box? These are questions that the plaintiff had to answer and failed to answer, and Knabel just doesn't get them there with his generic statement. We've asked the court to reverse and enter final judgment for overhead doors. Thank you very much for your time. Ms. Price, Ms. Price, Ms. Price. Yes, Chief Judge. Do you agree that the consumer expectation is, I can pull on this handle as much as I have strength to do so? Is, I'm sorry. Is it a reasonable consumer expectation that I can pull on this crate with as much power or strength that I have as an individual? No, sir. Why not? Because there is, there's, the standard in Virginia is that it has to be a, that the plaintiff has to establish that it's unreasonably dangerous for its ordinary or foreseeable use. That's what I'm asking you, counsel. I'm not talking about Virginia's standard. I'm talking about consumer use. Will the consumer assume that I can pull on it with what level of strength I have as an individual, not using a mechanism, but my individual strength? Don't you think that's within the realm of the consumer expectation? No, sir. Why not? Everybody who uses, some people who are going to use, pull on it, can't pick up a hundred pounds. Some people who will pull on it can pick up 250 pounds. So why wouldn't it be within the reasonable consumer's expectation that I can pull on it with whatever strength I have as an individual? Now, different if you use a mechanical device, like I'm going to take a machine and pull on it, but why wouldn't that not be in the realm of the consumer expectation? Respectfully, Your Honor, I think that your example answers that question. Under Virginia law, they have to establish a safety standard and the safety standard has to have some sort of objective measurement. And this particular handhold, they had to demonstrate that it was unreasonably dangerous because the pull resistance wasn't sufficient. And they didn't do that here. And their reasonable consumer expectation doesn't get them there. Okay. I know I'm not getting far with the physics. But if it's stuck on the forklift, do you agree that you can't pull on it more than your individual strength? That the pull does not increase because it's stuck on something. You still can't pull any more than you can pull on it. Do you agree with that? I'm not an engineer, and I don't... I'm not an engineer either. But I would respectfully disagree with that. When it's stuck and it can't move, and when you're pulling on the handle, when it's unstuck, it actually moves with you. When it's stuck and you're pulling on it, you are able to exert additional pull force on it. And that's the point. That force... What's the source of the force when you pull on it? That's what the point of... That's not a trick question. No matter how hard you pull on it, what is the source of the pull? The source of the pull is the person pulling on it. Right. That's the consumer. That's the point. You assume that if you walk up there, I can pull on this with all the might that I can muster to get it through. And that's what... That's the whole point of it. That would be in a consumer... I would say, well, let's see, whoa. I don't know how many I pulled on this thing because I bench pressed 250 last night. How many did I pull on? The consumer has to have that kind of, you know... It's kind of strange, isn't it? Matter of fact, don't these crates that you can sometimes contain up to 4,000 pounds or something? No, sir, I don't believe that the record supports that. I think that's for a garage door. That's a garage door. What's the maximum capacity for the content? Your Honor, truth be told, I don't remember off the top of my head and I don't want to guess. I know it's in the record somewhere and I'm happy to get that for you. You know, I can guess, but I don't... What's your guess? Pardon? What's your guess? I mean, you're supposed to know the record. What's your guess? I think that the record would support up to 300 pounds, maybe 500. I can't remember if it's somewhere within that range. You know, are you allowed to pull on it by hand, right? Yes, sir. Thank you. Go ahead. The last thing that I'll say, respectfully, Your Honor, is that the reason that Virginia allows you to establish unreasonably dangerous through these three mechanisms, government standards, industry standards, and reasonable consumer expectations, is so that manufacturers understand what the safety standard has to be. I think it's clear how they designed the crate and what capacity is. Like you said, 300 pounds. It's a whole lot of human exertion allowed you to pull a whole lot on that. Thank you all for that. I'm happy to answer any other questions. I appreciate your time this morning. Thank you so much, Ms. Price and Mr. Emmett. Thank you so much for your arguments. We can't come down and beat you, but we know that you very much appreciate your being here. I hope that you will continue to be safe and well. Take care.
judges: Roger L. Gregory, G. Steven Agee, Albert Diaz